COMMONWEALTH vs. DAVID LEE PARKER.

Suffolk. January 4, 1983. — April 29, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Practice, Criminal,* Capital case, Fair trial. *Identification.*

A defendant convicted of murder in the first degree was not entitled to a new trial under G. L. c. 278, § 33E, on the basis that testimony as to his identification was unreliable and uncorroborated, where a photographic identification of the defendant, coupled with in-court testimony concerning his identification, was sufficient to support the jury's verdict [30-32]; nor was a new trial warranted under § 33E on the contention that the jury's verdict had been improperly influenced by news media publicity and the accompanying public outcry about acquittals of two defendants in unrelated trials, where the record contained no indication of jury prejudice [32-33].

INDICTMENT found and returned in the Superior Court Department on November 7, 1980.

The case was tried before *Alberti, J.*

*Willie J. Davis* for the defendant.

*Daniel C. Mullane,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. During the early evening of September 17, 1980, Charles "Ricky" Talbert was shot by an assailant who wielded a sawed-off shotgun. Eyewitnesses made a photographic identification of the defendant as the assailant, and as a result, on September 22, 1980, he was charged with assault and battery by means of a dangerous weapon. Approximately six weeks later, Ricky Talbert died as a result of the gunshot wounds. The defendant was indicted for murder, and, after a trial by jury, he was convicted of murder in the first degree.[1] The defendant appeals. On

---

[1] The defendant was sentenced to life imprisonment at the Massachusetts Correctional Institution, Walpole.

appeal it is not claimed that there is any error of law on which to base a reversal. Rather, the defendant claims that the infirmities in the testimony of the witnesses who identified him require that we grant him a new trial pursuant to our power under G. L. c. 278, § 33E. The defendant also asserts that we should exercise our power under § 33E to grant him a new trial because of massive publicity in an unrelated murder case, which occurred at the outset of his trial. We reject the defendant's suggestions that we exercise our power under G. L. c. 278, § 33E, in his favor. We affirm.

We summarize the facts. Late in the afternoon of September 17, 1980, Ricky Talbert, Tyrone Sanders, and Melvin Hargrove went to a park in Dorchester. Sanders left the park for three or four hours. After he returned to the park between 7 and 8 P.M., he saw Ricky Talbert, Ricky's brother "Dump" Talbert, Hargrove, and several others sitting on the park wall. Some of the men were drinking beer and smoking marihuana. "Dump" Talbert, one of the men consuming beer and smoking marihuana, fell off the wall. The defendant and another man walked over to pick up "Dump" off the ground. Ricky Talbert prevented the men from picking up his brother by pushing and shoving them. He told the two men to leave his brother on the ground because his brother had "no business getting that high." A loud and heated exchange took place between the defendant and Ricky Talbert. The defendant apparently left the park and "Dump" Talbert was sent home.

The men then moved to two nearby park benches. The men heard a voice and looked up. They saw the defendant approaching them with a sawed-off shotgun. The defendant said to Ricky, "You shouldn't have done it. Don't do it no more." When Ricky looked up, the defendant shot him in the shoulder. Ricky tried to get up off the bench, and the defendant shot him in the stomach. Ricky fell to the ground, and the defendant said, "Do you want more?" The defendant opened the shotgun as if to reload it. Everyone began backing away. Hargrove and Sanders left the park.

After Sanders left the park, he attempted to telephone for help. He made two unsuccessful attempts to use the telephones in nearby stores. As he was entering a liquor store across from the park, he saw the defendant standing outside the park still holding the gun. Sanders then entered the store and succeeded in calling for help. Sanders returned to the park to await the police and an ambulance. He did not see the defendant at this time. Sanders had seen the defendant once or twice before this incident, but did not know the defendant's name.

When the police arrived, Sanders described the assailant to a Boston police officer. He told the officer that the assailant was a black male, about five feet, nine inches tall, with a short Afro haircut, wearing brown pants and a brown jacket. Later that evening, a Boston police detective, dressed in plainclothes and in an unmarked car, drove to a Mobil gasoline service station near the park. While the detective was at the station, the defendant approached him and asked what had happened. The defendant told the detective that he was coming from his hotel after receiving a telephone call at the hotel from his mother telling him to come home. The defendant was wearing brown pants, a brown shirt, and a brown sweater. There are no hotels or motels near the park.

Ricky Talbert was unconscious when the ambulance arrived. He was taken to Boston City Hospital, where he remained in the intensive care unit for approximately six weeks. Ricky never regained consciousness. Nevertheless, in late September or early October, 1980, one of Ricky Talbert's nurses saw a black male trying to enter Ricky's room. The intruder told the nurse he was Ricky's cousin, and that he wanted to see Ricky. The man would not leave and had to be removed physically from the intensive care unit by two nurses. About one and one-half hours after the incident, the nurse identified a photograph of the defendant as the intruder from an array of photographs presented by the police. At trial, the nurse admitted that she was "not sure" that the defendant was the same man as the intruder.

1. *Request for a new trial based on the weight of the evidence.* In his brief, the defendant claims that the identification of the defendant by Sanders and Hargrove is unreliable and uncorroborated, and therefore "the resulting conviction [is] based upon insufficient evidence." At oral argument, he concedes that the evidence is legally sufficient to withstand a motion for a required finding, but he claims that the conviction is against the weight of the evidence. He therefore concludes there is a substantial likelihood of a miscarriage of justice, and that we should grant him a new trial in spite of the fact that the evidence would be the same as it was at this trial.

The defendant does not claim that the evidence is insufficient to permit a rational trier of fact to find "the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia,* 443 U.S. 307, 319 (1979).[2] Rather, he claims that the poor lighting, the rapidity of the events, and the witnesses' descriptions of the assailant "cast doubt on their ability to positively identify [him]." Further, he asserts that the descriptions of the assailant's height, as well as the failure to describe his chipped tooth, make it "highly probable" that a misidentification actually occurred in this case. He asserts that at least one and probably both eyewitnesses were under the influence of alcohol or marihuana, or both, at the time of the shooting, thereby making their

---

[2] The defendant correctly does not argue that this case is similar to those cases where we reduced the conviction from murder in the first degree to murder in the second degree because the thrust of the evidence was more toward a verdict of murder in the second degree. See, e.g., *Commonwealth* v. *Dalton,* 385 Mass. 190, 195-197 (1982); *Commonwealth* v. *Tavares,* 385 Mass. 140, 159 (1982); *Commonwealth* v. *Cadwell,* 374 Mass. 308, 315-319 (1978); *Commonwealth* v. *Pisa,* 372 Mass. 590, 597-598, cert. denied, 434 U.S. 869 (1977); *Commonwealth* v. *Williams,* 364 Mass. 145, 151-152 (1973). In this case the evidence, if believed, indicated that the defendant left the park and obtained a sawed-off shotgun. He returned to the park and shot the unarmed victim twice, once in the shoulder and then in the stomach. This evidence, if believed, warrants a conclusion by the jurors that the assailant acted with deliberately premeditated malice aforethought. The defendant does not argue otherwise.

identifications even more suspect. The defendant concludes that his identification by these witnesses is therefore
insufficient to sustain his conviction. We do not agree.

The day after the shooting Sanders identified the assailant
from a photographic array. A few days after the incident,
Hargrove identified the defendant as the culprit from a photographic array.[3] Each witness identified Parker at trial.
The nurse identified the defendant as the intruder from the
photographic array within one and one-half hours of the incident at the intensive care unit. At trial, the nurse identified Parker as the intruder but admitted she was "not sure"
the intruder was the defendant. Finally, the defendant was
seen by the detective on the night of the shooting wearing
clothing which matched Sanders' description of the clothing
worn by the assailant. "The photographic identification,
coupled with the in-court testimony concerning identification, was sufficient to warrant submitting the case against
[the] defendant to the jury. . . . The fact that [the nurse's]
testimony was inconsistent . . . does not render the evidence
insufficient; all of her statements are entitled to be considered as probative evidence. . . . Credibility is a question for
the jury to decide; they may accept or reject, in whole or in
part, the testimony presented to them." *Commonwealth* v.
*Fitzgerald*, 376 Mass. 402, 410-411 (1978).

---

[3] Prior to trial, the defendant brought a motion to exclude the photographic identifications made by three witnesses. Parker claimed that the
photographs the police used in the photographic array from which the
three witnesses each selected the defendant's photograph were impermissibly suggestive. The defendant based his motion on the claim that no
other photograph pictured a subject with the precise kind of beard or
shortness of hair as the defendant's. There was no claim that the police
made any suggestions to the witnesses about the photographs. On appeal,
the defendant does not challenge as error the denial of this motion.
Therefore, any claim of error is deemed waived. *Commonwealth* v.
*Cundriff*, 382 Mass. 137, 150 n.22 (1980), cert. denied, 451 U.S. 973
(1981). Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).
However, pursuant to our obligation under G. L. c. 278, § 33E, we have
viewed the photographic array. We conclude that the photographic array was fair and not impermissibly suggestive. Thus, the judge's denial of
the defendant's motion does not give rise to a substantial likelihood of a
miscarriage of justice. G. L. c. 278, § 33E.

The jurors saw and heard the witnesses; they "were in a far better position to appraise the witnesses and [their identifications] than we now are. They had heard full discussion of all imaginable infirmities in the vital [identification] testimony of these witnesses. [The jurors] were warranted in believing the testimony." *Commonwealth* v. *French*, 357 Mass. 356, 398 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972).[4] Since "'the evidence was sufficient to support their verdict that the defendant was guilty of murder in the first degree,' *Commonwealth* v. *Cadwell*, 374 Mass. 308, 320 (1978) (Quirico, J., dissenting in part), there is no reason for us to exercise our power under § 33E. We are not a second jury." *Commonwealth* v. *Prendergast*, 385 Mass. 625, 638 (1982).

2. *The jury's exposure to publicity.* The defendant also contends that the jury's exposure to newspaper publicity and the accompanying public outcry about the acquittals of two defendants in unrelated trials impermissibly influenced them to return a guilty verdict in his case. After the jury were empanelled but before testimony was taken, a black male was acquitted of the murder of a taxi driver. The acquittal resulted from the confession of guilt by a codefendant before that jury. The jurors did not know that the codefendant had been acquitted of the murder and could not be retried. As a result, there was massive news media publicity. The defendant moved for a mistrial on the ground that such publicity would enrage the jurors and pressure them to return a guilty verdict in his case despite the prosecution's weaknesses. The judge invited defense counsel to suggest questions for a voir dire of the jurors, and adopted all the defendant's suggestions. The judge first asked each juror, "Did you read in the newspaper or hear on television of a

---

[4] The defendant filed a motion for a new trial claiming that the verdict was against the weight of the evidence or that a required finding of not guilty should be entered. Although the defendant has not briefed or argued the denial of his motion for a new trial on appeal, see Mass. R. A. P. 16 (a) (4), he has argued the same issues pursuant to G. L. c. 278, § 33E.

case conducted yesterday in this courthouse [or court] which resulted in the acquittal of a defendant?" Six of the sixteen jurors answered this question affirmatively. The judge then asked each of these six jurors a series of questions designed to probe for bias or prejudice or any other effect on the impartiality of the six jurors as a result of their exposure to the publicity concerning the other trial.[5] See *Commonwealth* v. *Jackson,* 376 Mass. 790, 797, 800-801 (1978).

The judge found that the six jurors had not been unduly prejudiced by the publicity, and that each could impartially decide the guilt or innocence of the defendant.[6] After the voir dire, the judge forcefully instructed the jurors. On each day of trial he reminded the jurors not to read anything in the newspaper, to watch anything on television, nor to listen to anything on the radio, either about the defendant's trial or about the criminal justice system, for the duration of the trial. Every time they returned to the courtroom the judge questioned the jurors as to whether they had read, heard, or seen any news media coverage of the defendant's trial or any criminal case. See *Commonwealth* v. *Cameron,* 385 Mass. 660, 668 (1982). On this record, there is "no indication that [Parker] was tried before a prejudiced jury," *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 225, cert. denied, 389 U.S. 916 (1967); see *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 532 (1975), and there is no substantial likelihood of a miscarriage of justice.

---

[5] After the judge conducted the voir dire of the jurors, he denied the defendant's motion for a mistrial. Although defense counsel conceded that the information elicited from the jurors did not warrant a mistrial, he reserved the right to renew his motion if it became apparent that the jurors were exposed to additional damaging publicity as the trial progressed. Parker did not renew his motion and, on appeal, is not claiming error in the judge's denial of his motion for a mistrial.

[6] Defense counsel stated at the close of the voir dire that the "evidence . . . with respect to the jurors, does not lend itself to any conclusion other than the fact that the defendant can get a fair trial with these jurors." On appeal, the defendant does not argue that the jurors were exposed to other publicity during the trial's progress that was prejudicial to the defendant.

"If the defendant committed the murder, as the jury were warranted in finding, neither the circumstances of the crime nor the defendant's circumstances call for a new trial or for any change in the verdict." *Commonwealth* v. *Rojas,* 388 Mass. 626, 631 (1983). Therefore, the defendant's request for a new trial pursuant to G. L. c. 278, § 33E, is denied.

*Judgment affirmed.*