# COMMONWEALTH *vs.* MARTIN G. GUY.

Norfolk. December 5, 2003. - February 25, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Admissions and confessions, Instructions to jury, Argument by prosecutor, Comment by prosecutor. *Malice. Constitutional Law,* Admissions and confessions. *Evidence,* Prior inconsistent statement, Impeachment of credibility.

At a murder trial, the Commonwealth presented sufficient evidence of deliberate premeditation and malice to warrant the defendant's conviction of murder in the first degree. [101-103]

A criminal defendant failed to demonstrate that the opening and closing statements of the prosecutor, the testimony of two witnesses, and the cross-examination of the defendant, which dealt with omissions from the defendant's voluntary pretrial statements to police and other third parties and inconsistencies between those statements and the defendant's trial testimony, constituted a violation of the prohibition contained in *Doyle* v. *Ohio,* 426 U.S. 610 (1976), against the use of a criminal defendant's post-Miranda silence against him. [103-107]

At a murder trial, the judge's instruction to the jury, permitting them to infer malice from the use of a dangerous weapon, was essentially correct and did not raise a substantial likelihood of a miscarriage of justice. [107-108]

A criminal defendant failed to demonstrate that the trial judge erred in providing written instructions to the jury over the defendant's objection (which instructions contained an outline of the elements of the various crimes encompassed by the murder indictment, but not of the defenses to those crimes), where the judge also instructed the jury that they had to find each element of the crime beyond a reasonable doubt, and where the judge provided the jury with an audiotape recording of the entire charge, which included the law of self-defense and other mitigating factors. [108-109]

At a murder trial, remarks in the prosecutor's closing argument did not provide a basis for reversing the defendant's conviction, where one comment suggested a permissible, although not particularly strong, inference from the evidence, and the others, which misstated certain evidence presented at trial, did not result in a substantial likelihood of a miscarriage of justice, when viewed in light of the strength of the Commonwealth's case and the judge's instructions to the jury. [109-112]

At a murder trial where the defendant raised the issue of credibility of the three eyewitnesses' testimony, it was not improper for the prosecutor in closing argument to comment on the consistency of their accounts. [112-113]

No reason appeared on the record of a murder trial for this court to exercise

its authority under G. L. c. 278, § 33E, to reduce the verdict or order a new trial. [113]

INDICTMENT found and returned in the Superior Court Department on October 26, 1999.

The case was tried before *Thomas E. Connolly*, J.

The case was submitted on briefs.

*Russell J. Redgate* for the defendant.

*William R. Keating*, District Attorney, & *James A. Reidy*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. A Superior Court jury convicted the defendant, Martin G. Guy, of murder in the first degree based on theories of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel, the defendant appeals from his conviction, asserting several errors: (1) the judge erred in denying his motions for a required finding of not guilty; (2) his post-Miranda silence was used against him at trial; (3) the judge erred in instructing the jury on malice; (4) the written instructions that the judge gave the jury were incomplete and prejudicial; and (5) the prosecutor's closing argument was improper. We find no merit to the defendant's claims of error. Additionally, because there is no substantial likelihood of a miscarriage of justice, there is no basis to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the verdict.

*Facts.* Based on the Commonwealth's evidence, the jury could have found the following facts. At approximately 2 A.M. on September 20, 1999, Anthony Ferrara was leaving his residence at the Norwood Inn, a rooming house, with his girl friend, Luciana Souza. When they reached the first-floor foyer, they heard loud male voices. Immediately after Ferrara and Souza went through the inn's main entrance, the victim, Christopher Payne, stumbled out the main door. The victim was moving quickly, but stumbling as if he were intoxicated. The victim stumbled into Ferrara, who grabbed onto the victim instinctively, trying to steady him by placing his right hand on the victim's chest, which was wet, and wrapping his left hand around the victim's body. The victim moved past Ferrara and

Souza and staggered down the side of Ferrara's vehicle, leaning his weight on the car. When the victim reached the rear of Ferrara's car, he fell on his face. During the fall, the victim's hands and arms remained at his side, failing to break the fall. After the fall, the victim was still breathing.

Immediately before the victim fell, the defendant emerged from the main door, armed with a machete-like knife. The defendant yelled, "Come back here, you son of a bitch." He walked over to the fallen, motionless victim, knelt down on one knee, raised the knife over his shoulder with both hands, and stabbed the victim in the back three times. The defendant got up and walked to the rear of the building. He later drove away from the scene in his red Ford Probe automobile.

Ferrara attempted to stop the victim's bleeding by using paper towels he retrieved from a nearby post office. Emergency medical personnel soon arrived, responding to the 911 call of Paul LaFleur, who observed the events outside from the window of his third-floor apartment at the rooming house. The paramedics continued to work on the victim until the advanced life support team arrived and transported him to a hospital, where he later died. An autopsy revealed that the victim had been stabbed eight times, and that he died from massive blood loss as a result of a three and one-quarter inch stab wound to his heart.

After leaving the Norwood Inn, the defendant drove to the nearby Norwood police station. He entered the station, held up his blood-covered hands, and stated that he had been stabbed. Lieutenant Richard Wall, the shift commander, took the defendant to an adjacent bathroom, asked him to wash the blood from his hands, and assessed the extent of the defendant's injuries, which were a cut on his left index finger and a scratch on the right side of his neck.[1] He asked the defendant what happened. The defendant told him that, in self-defense, he had just stabbed someone at the Norwood Inn.

Wall asked the defendant where the knife was, and the defendant said that it was in his car. The knife, with a piece of

---

[1] In addition, the standard police form detailing the defendant's injuries contained a notation that he had been hit on the side of the head. A photograph of the defendant revealed that he also had an abrasion on the left side of the chin.

the handle missing, was later located in the car. Subsequent deoxyribonucleic acid (DNA) testing determined that the blood on the knife matched the victim's DNA profile. Blood on the knife handle contained a mixture of DNA that matched the profiles of the victim and the defendant.

After the police learned that the victim had been stabbed and seriously injured, the defendant was arrested on the charge of assault and battery by means of a dangerous weapon. When the victim died, the defendant was charged with murder.

The defendant was transported to Norwood Hospital, where he remained in police custody. There, he spoke with Nurse Rita Hinthorne; Brian Gates and Chris King, security guards; and Officer Thomas Annino. The defendant told Hinthorne that he was unsure how his finger was cut, but that it happened during an altercation.[2] After King asked him how he was doing, the defendant told King that the victim had harassed him for a few weeks, and that, earlier that morning, the victim had knocked repeatedly on his door, and, when the defendant opened the door, the victim barged into the apartment, cornering him.

Officer Annino was guarding the doorway to the treatment room when the defendant spoke. Annino, who did not hear the defendant, replied, "What?" The defendant stated, "It never should have happened." The officer responded, "What?" The defendant explained that the victim knocked on the door to his apartment and, when the defendant opened it, the victim "came at [the defendant], swinging." The defendant stated that he was cornered, backed up against a wall, and that he acted in self-defense. The defendant also told Annino that the victim had been harassing him for years and that he had spoken to the manager of the rooming house about it, but the manager "laughed in [his] face."

Norwood police officers had been dispatched to the crime scene. Sergeant James Keady observed a heavy amount of blood in the parking lot. He followed a trail of blood from the parking lot into the rooming house, where he observed "a heavy concentration of blood" on the walls of the foyer and the first-

---

[2]The defendant did not indicate that he had suffered any other injuries.

floor hallway. The blood spatter analysis indicated that a series of blows had been inflicted on a person in the hallway, some delivered with significant force. DNA testing later determined that most of the blood was the victim's.

The hallway led to the defendant's apartment, a small (approximately eight feet by eight feet) room, "packed with items." Inside the apartment, the police observed nothing to indicate a disturbance. On the bed, the police found the opened box for the knife used by the defendant. The sheath to the knife and a broken piece of the knife handle lay next to the box. The police also observed that the top drawer of the defendant's bureau was open. In that drawer, they found six knife boxes, four of which contained knives in their sheaths.

The defendant testified at trial. He stated that at approximately 2 A.M. on September 20, 1999, he was awakened from his sleep by four knocks on the door. After he unlocked the door, the door was pushed in and someone hit him in the chest. The blow knocked the wind out of the defendant, and he stumbled back. The defendant testified that he then was struck on the side of his head by the handle of a knife.

The defendant further testified that he blocked the knife blow with his hand, had the knife held to his neck, and was threatened with death many times. The defendant grabbed his attacker's hand and pushed him back against the door. The struggle moved into the hallway. At some point, the defendant recognized his attacker as another resident of the rooming house.[3] The defendant said that the intruder smelled of alcohol.

The defendant testified that, eventually, he gained control of the knife and swung it at the victim as hard as he could, making contact. The defendant then lost control of the knife and struggled to regain it. At one point, the victim had his hands around the defendant's throat. Just before the victim went outside, he told the defendant, "I'm going to fucking shoot

---

[3]The defendant also stated that the victim had been harassing him for about one year preceding the incident. When asked why he had not complained to the management, the defendant explained that he thought "[t]hey'd probably laugh at [him]."

you." The defendant followed the victim outside the door, struck him in the head with the knife, and stabbed him in the back.[4]

*Discussion.*

1. *Denial of motions for required finding of not guilty.* At the close of the Commonwealth's evidence and at the conclusion of the evidence, the defendant moved for a required finding of not guilty, arguing that the evidence was insufficient to support a charge of murder in the first degree. The judge denied both motions. On appeal, the defendant argues that the judge erroneously denied his motions because there was insufficient evidence of deliberate premeditation, malice, and extreme atrocity or cruelty.

In reviewing the denial of a motion for a required finding of not guilty, we consider the evidence, together with permissible inferences from that evidence, in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), and "determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Cordle*, 412 Mass. 172, 175 (1992). See *Commonwealth* v. *Grandison*, 433 Mass. 135, 140-141 (2001). The relevant inquiry is "whether the evidence would permit a jury to find guilt, not whether the evidence requires such a finding." *Commonwealth* v. *Fisher*, 433 Mass. 340, 342-343 (2001), quoting *Commonwealth* v. *Lydon*, 413 Mass. 309, 312 (1992). The Commonwealth may rely on inferences drawn from the evidence, as long as these inferences are "reasonable and possible." *Id.* Viewing the evidence in the light most favorable to the Commonwealth, we conclude that the Commonwealth presented sufficient evidence of deliberate premeditation, malice, and extreme atrocity or cruelty to warrant a verdict of guilty of murder in the first degree.

a. *Deliberate premeditation.* A defendant deliberately premeditates when he forms a plan to kill after deliberation and reflection, but the law does not require a particular length of time to show deliberate premeditation. *Commonwealth* v. *Coren*, 437 Mass. 723, 730 (2002), and cases cited. It may be a matter of days, hours, or even seconds. *Id.* "It is not so much a matter

---

[4]We shall discuss the remaining facts as they pertain to the specific issues raised.

of time as of logical sequence. First the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds." *Commonwealth* v. *Palmariello*, 392 Mass. 126, 143 (1984), quoting *Commonwealth* v. *Tucker*, 189 Mass. 457, 495 (1905).

Obtaining and using a weapon at close range and the pursuit of a wounded victim, among other factors, permit an inference of premeditation. See *Commonwealth* v. *Johnson*, 435 Mass. 113, 119 (2001); *Commonwealth* v. *McAfee*, 430 Mass. 483, 494-495 (1999), and cases cited; *Commonwealth* v. *Torres*, 420 Mass. 479, 494 (1995); *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). The proof presented by the Commonwealth in this case "established circumstances from which the jury could reasonably infer in light of common experience that the defendant intentionally killed the victim after deliberate premeditation." *Commonwealth* v. *Latimore, supra* at 678.[5] Here, there was evidence that the defendant deliberately selected a knife from his collection of knives to use on the victim. See *Commonwealth* v. *Watkins*, 373 Mass. 849, 852 (1977) (evidence that defendant went to kitchen, picked up knife, and returned to stab victim was sufficient to prove deliberate premeditation). This choice, as well as his pursuit of the fleeing, wounded victim, supports the jury's finding of deliberate premeditation.[6] See *Commonwealth* v. *Degro*, 432 Mass. 319, 325 (2000) (eyewitness evidence of encounter, together with fact that defendant was carrying large knife and stabbed victim three times after twice punching him, warranted finding

---

[5]The defendant attempts to dismiss the Commonwealth's proof of premeditation as "meager circumstantial evidence." The argument is without merit. This court has long held that circumstantial evidence "may be a thoroughly satisfactory basis for conviction of the highest crimes." *Commonwealth* v. *Chipman*, 418 Mass. 262, 268 (1994), quoting *Commonwealth* v. *Richmond*, 207 Mass. 240, 246 (1911). See *Commonwealth* v. *Thompson*, 431 Mass. 108, 113, cert. denied, 531 U.S. 864 (2000), quoting *Commonwealth* v. *Bush*, 427 Mass. 26, 30 (1998) ("Circumstantial evidence 'is competent to establish guilt beyond a reasonable doubt' "); *Commonwealth* v. *Woods*, 414 Mass. 343, 354, cert. denied, 510 U.S. 815 (1993) ("a conviction may rest entirely on circumstantial evidence").

[6]There was also evidence that the defendant pursued the victim down a hallway, stabbing him five times.

of deliberate premeditation). This evidence amply supports a finding of a plan to kill.

b. *Malice.* Where, as here, the defendant has presented some evidence raising the possibility of mitigation, the Commonwealth must prove, and the jury must find, the absence of mitigation beyond a reasonable doubt. *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 561 (2001). The defendant argues that the Commonwealth presented insufficient evidence proving the absence of mitigation. We disagree.

The Commonwealth's physical evidence, namely the evidence of the knife and the box from which it came, permitted an inference that the defendant had some time to select his weapon and formulate the requisite malice. In addition, the evidence that the defendant's apartment had been undisturbed contradicted the defendant's account of a struggle.[7] Finally, three eyewitnesses observed the defendant go to the victim, as he lay motionless on the ground, and stab him three times in the back. The evidence, viewed in the light most favorable to the Commonwealth, was sufficient to persuade a rational trier of fact that the Commonwealth had met its burden. *Commonwealth* v. *McAfee, supra* at 496.[8]

2. *The defendant's post-Miranda statements.* The defendant argues that his post-Miranda silence was used against him several times at trial in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 618-619 (1976). "A defendant's silence after the police have given the warnings mandated by *Miranda* v. *Arizona*, 384 U.S. 436, 467-479 (1966), may not be used against that defendant" to impeach an exculpatory explanation subsequently offered at trial. *Commonwealth* v. *Waite*, 422 Mass. 792, 797 (1996). See *Commonwealth* v. *Thompson*, 431 Mass. 108, 118,

---

[7]As the defendant's brief concedes, the sole evidence of mitigation came from the defendant's own testimony. The jury, as the finders of fact, were free to reject the defendant's version of events in its entirety. *Commonwealth* v. *Parker*, 389 Mass. 27, 31 (1983), quoting *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 411 (1978) (credibility of witness is jury question; jury "may accept or reject, in whole or in part, the testimony presented to them").

[8]Because we conclude that there was sufficient evidence of deliberate premeditation for the jury to find the defendant guilty of murder in the first degree, we need not address the issue whether there was sufficient evidence of extreme atrocity or cruelty.

cert. denied, 531 U.S. 864 (2000), and cases cited (evidence of defendant's postarrest, post-Miranda silence cannot be used against him for substantive purpose of permitting inference of guilt). The opening and closing statements of the prosecutor, the testimony of two witnesses, and the cross-examination of the defendant form the basis of the alleged *Doyle* violations.

a. *Prosecutor's opening statement.* In his opening statement, the prosecutor said the following to the jury regarding the defendant's postarrest conversation with Officer Annino:

> "Never in that conversation, you'll hear, did the defendant say anything that occurred out in the hallway [on the morning of the stabbing], nothing about anything that occurred in the parking lot. Later he'll tell [the booking] officer that he was hit on the side of the head. And that will be the sum of every complaint this defendant will issue."

The defendant's trial counsel did not object; the appellate counsel now argues that the statement was a *Doyle* violation.

The prosecutor's remarks were proper. By talking to the officers on his own volition, the defendant waived his Miranda rights (and he does not argue to the contrary). What the defendant thereafter chose to say or not say to each officer on the subject could properly be commented on by the prosecutor to expose inconsistencies. *Commonwealth* v. *Snell*, 428 Mass. 766, 772-773, cert. denied, 527 U.S. 1010 (1999) (where defendant voluntarily waived his Miranda rights and spoke with police, his statements and omissions were "appropriate matters for comment and exploration" by prosecutor in opening statement). See *Commonwealth* v. *Thompson, supra* at 117-118 (where defendant agreed to speak with police, it was proper for prosecutor, in closing argument, to comment on fact that defendant did not ask questions that innocent person would likely have asked); *Commonwealth* v. *Martino*, 412 Mass. 267, 283 (1992) (prosecutor entitled to comment on difference between defendant's post-Miranda pretrial statements and his testimony at trial). See also *United States* v. *Goldman*, 563 F.2d 501, 503 (1st Cir. 1977), cert. denied, 434 U.S. 1067 (1978), quoting *Vitali* v. *United States*, 383 F.2d 121, 123 (1st Cir. 1967) ("A defendant cannot have it both ways. If he talks, what

he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to").

b. *Trial testimony.* Contrary to the defendant's contention, the prosecutor properly introduced evidence of the defendant's statements to the booking officer, Sergeant Keady. Keady testified that, in response to a routine booking question concerning whether he had any injuries, the defendant stated only that he had been hit on the side of the head.[9] The defendant's trial counsel did not object.[10] Keady's question to the defendant was directed to the defendant's physical state at the time of booking, an important fact for the police, who had taken physical custody of the defendant and bore liability for his physical well-being, to record. Thus, the information gained from the defendant falls outside of the scope of *Miranda* v. *Arizona, supra* at 467-479, as a response to a routine booking question.[11] *Commonwealth* v. *White,* 422 Mass. 487, 501 (1996). Furthermore, because the prosecutor withdrew the first question on this subject (see note 10, *supra*) before it was answered, there can be no error with respect to that question. See *Commonwealth* v. *Waite, supra* at 798-799 (no error occurred where no answer was given to question asked that would have implicated post-Miranda silence).

The defendant next argues that *Doyle* problems "emerge[d] full-blown during [his] cross-examination." The problems arose, he claims, when the prosecutor inquired into conversations the defendant engaged in after he was arrested. At the hospital, in police custody, he spoke with a nurse, a security guard, and a

---

[9]Keady recorded the defendant's reply on a standard booking sheet. The form also contained a line to explain the injuries. Keady stated that he wrote, "Hit on side of head," and nothing else on that line.

[10]Keady was first asked if the defendant ever told him that a knife had been held to his throat. The defense counsel objected, and after a sidebar conference, the prosecutor withdrew the question. The prosecutor then asked whether the form contained any other information. The defendant did not object to that question, but now claims it was improper.

[11]Even if Keady's question were not a routine booking question, the defendant still cannot demonstrate a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Thompson,* 431 Mass. 108, 118 n.8 (2000). See also note 10, *supra* (trial counsel did not object to last question). Even without Keady's testimony, the Commonwealth, on numerous occasions, properly demonstrated inconsistencies in the defendant's protestations of self-defense.

police officer (Officer Annino). The defendant admitted that although he made statements to these people concerning the stabbing, he failed to make other statements, including that he had been choked and had had a knife held to his throat.

The line of questioning was proper. The prohibition of *Doyle* applies only to police interrogations. *Doyle* v. *Ohio*, 426 U.S. 610, 617-620 (1976). Moreover, where, as here, a defendant voluntarily makes post-Miranda statements, and then testifies at trial, in order to expose inconsistencies and differences in testimony, a prosecutor may inquire into "the omission[s] from a [defendant's] pretrial statement[s] where it would have been natural to include the omitted fact[s]." *Commonwealth* v. *Rivera*, 425 Mass. 633, 639 (1997), and cases cited (defendant who testifies "is subject to the ordinary rigors of proper cross-examination," including questions about prior voluntary statements). See *Commonwealth* v. *Thompson, supra* at 117-118.[12]

For the same reasons, there was nothing improper in the prosecutor's calling the defendant's sister as a rebuttal witness to show that, while making some statements to her about the stabbing, the defendant did not provide certain details to which he testified at trial. Although the defendant made statements to his sister while he was incarcerated, there was no custodial interrogation. See *Doyle* v. *Ohio, supra* at 619.

c. *Prosecutor's closing argument.* Finally, the prosecutor's comments in his closing argument concerning what details of the stabbing the defendant did *not* relay to certain witnesses

---

[12]The defendant claims that, in violation of *Doyle* v. *Ohio,* 426 U.S. 610 (1976), the prosecutor questioned him concerning the omissions from his statements to Officer Annino regarding being choked. However, the defendant never answered the question. Immediately after eliciting from the defendant the details of his statement to Annino, the prosecutor asked him, "You didn't tell him anything about being choked?" Defense counsel objected, and after a sidebar conference, the judge overruled the objection. The prosecutor never asked the question again. After the sidebar, the prosecutor asked the defendant, "Again, sir, that was what you told Officer Annino. Correct?" The prosecutor then turned his cross-examination to a different aspect of the defendant's statement to Annino. Thus, the defendant's answer to the prosecutor's question regarding what he did not tell Annino was never in evidence. As the judge instructed the jury, "The question put to a witness is not evidence. Only the answers are evidence." The defendant's silence was not used against him. See *Commonwealth* v. *LaFaille,* 430 Mass. 44, 54 (1999).

were appropriate. The defendant's trial testimony varied from what witnesses testified that he had told them. He chose not to exercise his right to remain silent when he spoke with those witnesses, some of whom were civilian witnesses. In his closing, the prosecutor properly commented on omissions from the defendant's pretrial statements and inconsistencies between these statements and the defendant's trial testimony. See *Commonwealth* v. *Sleeper*, 435 Mass. 581, 594 (2002) (prosecutor may comment in closing on differences between defendant's testimony at trial and defendant's pretrial statements, including post-Miranda statements).

3. *Jury instructions.* The defendant next argues that the judge's instruction to the jury, given twice, that an inference of malice may be drawn from the use of a dangerous weapon was "badly misplaced in the first instance," permitting an improper inference of first prong malice (specific intent to cause death) from the use of a dangerous weapon. Because the defendant did not object to that instruction, we review the instructions to determine whether there is a substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998). See *Commonwealth* v. *Cook*, 438 Mass. 766, 772, cert. denied, 540 U.S. 850 (2003). To determine whether there was an error, we "read[] the charge as a whole, [instead of] scrutinizing bits and pieces removed from their context." *Commonwealth* v. *Benjamin*, 430 Mass. 673, 681 (2000), quoting *Commonwealth* v. *Perry*, 385 Mass. 639, 647 (1982). See *Commonwealth* v. *Moses*, 436 Mass. 598, 604 (2002).

The jury are permitted to infer malice from the use of a dangerous weapon. See *Commonwealth* v. *Benjamin, supra,* and cases cited (that malice may be inferred from intentional use of dangerous weapon is settled law). See also *Commonwealth* v. *Obershaw*, 435 Mass. 794, 809 (2002). The judge's instruction on the inference of malice, set forth below, essentially tracked the language of our model instructions.[13] See Model Jury Instructions on Homicide 61 (1999). The judge followed the model instructions in providing this instruction twice: first, in

---

[13]The judge instructed the jury: "As a general rule you are permitted to infer that a person who intentionally uses a dangerous weapon on another

connection with the charge on deliberate premeditation, after the proper definition of first prong malice, and second, in conjunction with the charge on extreme atrocity or cruelty. See Model Jury Instructions on Homicide, *supra* at 8, 12. There was no error.

4. *Written instructions to the jury.* Over the objection of defense counsel, the judge provided the jury with a written outline of the elements of the various crimes encompassed by the murder indictment: murder in the first degree based on deliberate premeditation and extreme atrocity or cruelty; murder in the second degree; and voluntary manslaughter, including voluntary manslaughter caused by excessive use of force in self-defense. The defendant maintains that these instructions were incomplete and prejudicial because they omitted important concepts of law that were favorable to the defense, such as the law of self-defense and the mitigating factors of provocation and sudden combat. The defendant claims that, because he objected at trial, the judge erred in providing the jury with the outline, as both parties must agree before any portion of the judge's instruction is provided in writing to a jury. See *Commonwealth* v. *Dilone*, 385 Mass. 281, 287 n.2 (1982). The defendant's contention is erroneous.

A judge may provide the jury with an accurate statement of the elements of a crime in a summary form, in writing, without the parties' consent. *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 422 (1998). In the *DiBenedetto* case, the court concluded that the judge did not err in placing the elements of the crime on the blackboard. The court explained, "If we allow jurors to try to write out the elements of a crime as a judge recites them, it would be strange to forbid a judge from following a more reliable course and *giving the jury those elements in writing* or setting them forth on a blackboard" (emphasis added). *Id.* The court further stated that "it is now time to recognize that reasonable steps to assist a jury in performing their function should be encouraged. As long as the judge makes it clear that the jury must find each element of the crime beyond a reasonable doubt, a judge may, in the exercise of discretion, provide a jury with

person is acting with malice. A dangerous weapon is an item that is capable of causing serious injury or death."

an accurate statement of the elements of each crime charged."
*Id.*

Because the judge instructed the jury in accordance with
*Commonwealth* v. *DiBenedetto, supra,* i.e., that they must find
each element of the crime beyond a reasonable doubt, there was
no abuse of discretion. There is no requirement that a judge
provide an outline of the defendant's defenses. *Id.* See *Com-
monwealth* v. *Larkin,* 429 Mass. 426, 439 (1999) (judge did not
err in charting on blackboard only elements of murder and not
elements of other offenses, including manslaughter, aggravated
rape, and unarmed robbery). In addition, to the extent the jurors
needed to revisit the law in the area of self-defense and mitigat-
ing factors, they were able to do so during their deliberations
because the judge had provided them with an audiotape rec-
ording of his entire charge. See *Commonwealth* v. *Baseler,* 419
Mass. 500, 505-506 (1995) (tape recording of entire charge is
reasonable way to make judge's instructions available to jury;
parties' consent not required).

5. *Propriety of the prosecutor's closing argument.* The
defendant argues that the prosecutor's closing argument was
improper because it misstated several important points of
evidence and that the prosecutor improperly vouched for the
Commonwealth's witnesses. Because the defendant did not
object to the portions of the prosecutor's closing argument he
now challenges, the court must review whether any such errors
created a substantial likelihood of a miscarriage of justice. See
*Commonwealth* v. *Maynard,* 436 Mass. 558, 569-571 (2002). In
making that determination, the cumulative effect of all the er-
rors must be "considered in the context of the arguments and
the case as a whole." *Id.* at 570. We are guided by the follow-
ing factors: "whether 'defense counsel seasonably objected to
the arguments at trial . . . whether the judge's instructions
mitigated the error . . . whether the errors in the arguments
went to the heart of the issues at trial or concerned collateral
matters . . . whether the jury would be able to sort out the
excessive claims made by the prosecutor . . . and whether the
Commonwealth's case was so overwhelming that errors did not
prejudice the defendant.' " *Id.,* quoting *Commonwealth* v. *San-
tiago,* 425 Mass. 491, 500 (1997), *S.C.,* 427 Mass. 298 and 428

Mass. 39, cert. denied, 525 U.S. 1003 (1998). We address each issue in turn, and conclude that there is no basis for reversing the defendant's conviction.

a. *Misstating evidence.* Prosecutors must limit the scope of their closing arguments to facts in evidence and the fair inferences that may be drawn therefrom. *Commonwealth* v. *Stote*, 433 Mass. 19, 28 (2000). See *Commonwealth* v. *Christian*, 430 Mass. 552, 565 (2000); *Commonwealth* v. *Good*, 409 Mass. 612, 623 (1991). Arguments not supported by evidence or reasonable inferences from it are improper. *Commonwealth* v. *Murchison*, 418 Mass. 58, 60 (1994).

1. The Commonwealth concedes that the prosecutor's statement that the defendant testified that, after the stabbing, he had returned to his room to make a telephone call, was erroneous. The Commonwealth contends that, despite the error, no substantial likelihood of a miscarriage occurred because the remark, in the form of a rhetorical question, came from an inference supported by the evidence, namely the testimony of three witnesses that, after the stabbing, the defendant walked back toward the rooming house's main entrance (i.e., in the direction of his room).[14] In light of the strength of the Commonwealth's case, and the judge's instructions to the jury that closing arguments are not evidence, we conclude that the statement does not raise a substantial likelihood of a miscarriage of justice.[15] See *Commonwealth* v. *Degro*, 432 Mass. 319, 329 (2000).

2. The prosecutor's comments suggesting that the defendant had been wearing a baseball cap when he stabbed the victim were founded on the evidence presented at trial and, thus, not improper. *Commonwealth* v. *Duguay*, 430 Mass. 397, 404

---

[14]In his closing, the prosecutor argued to the jury that the transfer stain on the door to the defendant's room was made when he returned to his apartment after stabbing the victim. Based on the testimony of the eyewitnesses, the prosecutor drew the inference that the defendant returned to his room before leaving the rooming house and placed the stain on the door at that time.

[15]The fact that no objection was made at trial lends further support to the inference that the prosecutor's misstatement was "not so egregious and prejudicial as [the defendant] now claims." *Commonwealth* v. *Maynard*, 436 Mass. 558, 570 (2002). See *Commonwealth* v. *Duguay*, 430 Mass. 397, 404 (1999).

(1999). *Commonwealth* v. *Raymond*, 424 Mass. 382, 390 (1997). There was evidence that, when he entered the police station after the stabbing, the defendant was wearing a baseball cap and had blood on his hands. The defendant testified that he could not recall whether he had been wearing the cap during the altercation and conceded on cross-examination that he did not remember putting it on before entering the police station. The defendant also testified that the first time he realized that he had blood on his hands was when he entered the police station. As reflected in the prosecutor's cross-examination of the defendant, it was reasonable to infer from this evidence that had the defendant put his cap on after the stabbing, he would have noticed the blood on his hands then.[16]

The prosecutor stated: "That baseball cap. Did he go through this whole life and death battle with a baseball cap on his head? Was he rolling around on the carpets with a baseball cap on his head? Or did he just pull into the police station and put it on so he'd look his best when he went in?" The prosecutor's remark suggested a permissible, although not particularly strong, inference from evidence that challenged the defendant's claim of a life and death struggle before the stabbing. See *Commonwealth* v. *Duguay, supra*; *Commonwealth* v. *Raymond, supra* (evidence, while not compelling, was "sufficient to justify the prosecutor's argument").

3. The defendant next contends that the prosecutor erred when he argued the possibility that words were exchanged through the open window in the defendant's room.[17] As the defendant concedes in his brief, one of the police officers dispatched to the scene testified that windows were open. However, the prosecutor's remark that the defendant and the

---

[16]There was some contrary evidence as well. One of the eyewitnesses, Anthony Ferrara, when asked whether the man he saw stabbing the victim had a hat on, responded, "I would say no, because I described him as short, fat, and balding, I think." Another eyewitness, Paul LaFleur, when asked whether the defendant had a hat on at the time of the stabbing, first answered, "No, he did not," but revised his answer almost immediately and stated that he could not remember.

[17]The prosecutor stated: "That window's open." He later added: "Ladies and gentlemen, whatever transpired through that open window, into the hallways at 32 Guild Street that early morning, left this [d]efendant pissed off."

victim may have had a conversation through the window was "not fairly inferable from the evidence" presented at trial. *Commonwealth* v. *Coren*, 437 Mass. 723, 732 (2002), quoting *Commonwealth* v. *Pope*, 406 Mass. 581, 587 (1990). In light of the strength of the Commonwealth's case, and the judge's instructions to the jury that closing arguments are not evidence, we conclude that the prosecutor's misstatement does not raise a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Degro, supra*.

4. During the trial, the prosecutor impeached the defendant's sister with her grand jury testimony that the defendant had told her that the altercation was "all fists." In his closing argument, however, the prosecutor stated: "He [the defendant] told the grand jury [the altercation] was all fists." The Commonwealth concedes that this assertion was improper. This mistaken assertion, the defendant argues, if believed by the jury, would have "affirmative[ly] impeach[ed]" the defendant's trial testimony about the knife and would have amounted to an admission by the defendant that he had lied to the grand jury. Because the defendant's credibility was central to his defense of provocation and mitigation, the error, the defendant claims, requires a new trial.

The misstatement by the prosecutor constituted error and we must now decide if the error was prejudicial. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 353 (1998). "For that determination, our answer depends heavily on the strength of the evidence against the defendant," which was overwhelming. *Id.* On this record, given the strength of the Commonwealth's case, particularly the testimony of the three eyewitnesses, and the defendant's failure to object, and in light of the judge's instructions to the jury that closing arguments are not evidence, this misstatement did not result in a substantial likelihood of a miscarriage of justice. *Id.* See *Commonwealth* v. *Degro, supra* at 329.

b. *Improper vouching.* Improper vouching occurs if "an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury." *Commonwealth* v. *Wilson, supra* at 352. The defendant claims that the prosecutor improperly

vouched for the credibility of the Commonwealth's eyewitnesses when, during closing, the prosecutor stated that, "while sisters can change testimony, the tale of the blood on those walls doesn't change. And those eyewitnesses' testimony doesn't change."

Where the credibility of a witness is at issue, "it is certainly proper for counsel to argue from the evidence why a witness should be believed." *Commonwealth* v. *Raymond, supra* at 391, quoting *Commonwealth* v. *Thomas*, 401 Mass. 109, 116 (1987). See *Commonwealth* v. *Murchison*, 418 Mass. 58, 60 (1994) (witness credibility "is obviously a proper subject of comment"). The defendant attempted to impeach the eyewitness testimony of Souza, Ferrara, and LaFleur with prior inconsistent statements. In addition, in his closing statement, the defense counsel argued that the witnesses were not sure what they saw that night. The prosecutor merely responded to that assertion, arguing that the witnesses' accounts of the events were consistent. The prosecutor's reference to the defendant's sister, who essentially repudiated her previous testimony to the grand jury, was meant as a contrast to the testimony of Souza, Ferrara, and LaFleur.

Because the defendant raised the issue of credibility of the three eyewitnesses' testimony, it was not improper for the prosecutor to comment on the consistency of their accounts; he did not vouch for their credibility. *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993) ("the prosecutor may make a fair response to an attack on the credibility of a government witness"). See *Commonwealth* v. *Raymond, supra.* Furthermore, given the context in which the prosecutor's statement was made, we do not think that the jury would have understood the statement as an assertion of the prosecutor's personal belief. *Id.*

6. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record on both the law and the facts pursuant to our obligation under G. L. c. 278, § 33E, and conclude that the defendant is not entitled to relief of any kind. The defendant's conviction is supported by overwhelming evidence. The interests of justice do not require either a new trial or the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*