## COMMONWEALTH *vs.* RAYMOND COOK.

Bristol. January 10, 2003. - March 5, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, New trial, Medication of defendant during trial, Capital case. *Mental Impairment. Insanity. Constitutional Law,* Waiver of constitutional rights. *Waiver.*

At a murder trial, the judge correctly instructed the jury that they could consider the defendant's mental impairment, if any, in determining the defendant's capacity to form the specific intent to kill or to inflict grievous bodily harm, and correctly instructed them on criminal responsibility in accordance with the standards of *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967); further, the judge's instruction to the jury on "diminished capacity manslaughter," which allegedly shifted the burden of proof on the issue of insanity to the defendant, did not create a substantial likelihood of a miscarriage of justice, where the judge repeatedly instructed the jury that the defendant had no burden of proving his lack of criminal responsibility, and where, given that the jury returned a verdict of murder in the first degree, it was unlikely that they even considered a manslaughter verdict. [772-773]

At a murder trial, there was no substantial likelihood of a miscarriage of justice created by the judge's failure to read to the jury the last sentence of the murder statute, G. L. c. 265, § 1, that "[t]he degree of murder shall be found by the jury," where, based on an examination of the entire charge, the judge conveyed the proper legal concepts to the jury and the judge's omission did not deprive the jury of their power to find the appropriate degree of murder. [774-775]

On a motion for a new trial in a murder case accompanied by the defendant's submissions that claimed his trial counsel had failed to honor his choice not to present a defense based on a lack of criminal responsibility, the motion judge did not err in concluding that the defendant's submissions did not raise a substantial issue requiring an evidentiary hearing, where sufficient evidence that the defendant had agreed to the presentation of the defense of lack of criminal responsibility warranted the judge in rejecting the defendant's submissions. [775-776]

The judge in a murder case did not err in denying a motion for a new trial on the ground that the trial record did not support a finding that the defendant had made a knowing, intelligent, and voluntary decision not to testify, where the record demonstrated that the defendant's trial counsel repeatedly informed the defendant that the ultimate decision whether to testify belonged to him. [776-777]

The judge in a murder case correctly denied a motion for a new trial on the

ground that the record allegedly did not support an intelligent and voluntary decision by the defendant to be medicated at trial, where the defendant made no showing that he was medicated against his will or that he even asked to stop taking medication. [777]

This court declined to exercise its power under G. L. c. 278, § 33E, where the evidence in a murder case amply supported the jury's finding of extreme atrocity or cruelty and the jury's rejection of an insanity defense. [777-778]

INDICTMENT found and returned in the Superior Court Department on September 14, 1994.

The case was tried before *John A. Tierney*, J., and a motion for a new trial, filed on October 6, 2000, was heard by him.

*Ruth Greenberg* for the defendant.

*Steven E. Gagne*, Assistant District Attorney (*Kevin Connelly*, Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty.[1] Represented by new counsel following his conviction, the defendant argues error in the judge's instructions to the jury. The defendant also asserts that the judge erred in denying his motion for a new trial based on (1) the judge's failure properly to instruct the jury on their right to decide the degree of murder; (2) the judge's failure to conduct a colloquy with the defendant to confirm that he knowingly and voluntarily desired to present an "insanity defense" or that he waived such a defense; (3) the deprivation of his right to testify at trial; and (4) the deprivation of his right to appear unmedicated at trial. The defendant also seeks relief pursuant to G. L. c. 278, § 33E. We reject all claims of error. We also discern no basis to grant relief under G. L. c. 278, § 33E. Accordingly, we affirm the defendant's conviction and the order denying his motion for a new trial.

The background of the case is as follows. On the afternoon of August 24, 1994, Officer Thomas Guinta of the Fall River police department was in uniform delivering parking permits to residents on Middle Street for use during an upcoming event in the neighborhood. Jean Felix and her daughter, residents of a

---

[1] The Commonwealth had proceeded on theories of both deliberate premeditation and extreme atrocity or cruelty.

second-floor apartment at 591 Middle Street, were outside that building and saw Officer Guinta enter it. The defendant lived in the first-floor apartment. Felix and her daughter heard the defendant ask, "Who is it?," and then heard Officer Guinta reply, "The police." The women then heard yelling, scuffling, and shots. Felix ran next door to dial 911. The defendant, "full of blood," and holding a revolver and a walkie-talkie, walked down the stairs leading from his apartment. Felix asked him what he had done, and the defendant replied, "Well, he tried to shoot me, so I shot him back." Felix said that the officer needed help and asked whether the defendant would shoot her if she went up the stairs. The defendant answered, "No, Jen."[2]

Felix found Officer Guinta lying on the hallway floor outside of the defendant's apartment. Officer Guinta was bleeding profusely and was gurgling. Felix asked the defendant to get some towels as she began chest compressions. The defendant placed a pillow under Officer Guinta's head, then kicked him and said, "He's only faking, anyway."

Detective Leo Rebello arrived at the scene. As the detective approached the stairway, gun drawn, he saw the defendant step out onto the landing holding what turned out to be Officer Guinta's handgun, and observed on the stairs a police radio with blood on it. On seeing Detective Rebello, the defendant stated, "You don't need that, you don't need that." Detective Rebello followed the defendant into the building and observed Officer Guinta on the hallway floor. Detective Rebello pushed the defendant against the hallway wall, and the defendant dropped the handgun. In his right hand the defendant held a speed loader, a device that holds ammunition, and a Fall River police badge, which Detective Rebello had to pry out of his hand. Detective Rebello handcuffed the defendant, moved him back into his apartment, and seated him on a mattress on the floor. The defendant said, "[I] shouldn't have, [I] shouldn't have."

Detective John DeMello entered the building after Detective Rebello. He saw the defendant drop the gun. Detectives Rebello and DeMello performed cardiopulmonary resuscitation on Officer Guinta. His eyes were open, he had a pulse, and he was

---

[2]The defendant called Jean Felix "Jen" because he thought she was "Jen" whom he supposedly knew from Boston.

gasping for air. There was a pool of blood underneath him. Officer Guinta soon thereafter was pronounced dead. A medical examiner testified that he had died from multiple gunshot wounds, with death occurring minutes after the shooting. Officer Guinta suffered three gunshot wounds: a close contact wound to his upper back, at the base of his neck, penetrating his heart and lung; a wound to his lower back; and a wound below the right knee. Officer Guinta also had abrasions and contusions consistent with having been in an altercation.

Other police officers arrived. Sergeant Albert Dupere heard the defendant state, "I don't know who did it." Officer Wayne Pope heard the defendant state, "I didn't do it. Three guys did it. They ran." The defendant told Officer Michael Malek that he "didn't do it," and that there were three black males who had run out the back door. Officer Malek checked the apartment, but found no back door and no other suspects. The defendant seemed very nervous, but not excited, and he spoke in a low voice. While being transported to the police station, the defendant talked to himself in a low monotone.

At the police station, State Trooper Keith Blaney advised the defendant of his Miranda rights, and then interviewed him. The defendant was calm, and his answers were timely and articulate. After providing some information about his background, the defendant recounted his day's activities. The defendant stated that he awoke from a nap to an altercation outside his apartment's door. He heard several bangs, opened the door and saw Officer Guinta lying on his side, bleeding, on the hallway floor. The defendant asked Officer Guinta if he was alright. The officer replied that he was, and asked the defendant to get help. The defendant saw the officer's police radio on the stairwell and tried to call on it. A police officer arrived, asked the defendant "if he was okay," and then handcuffed him. The defendant denied having handled Officer Guinta's service revolver or badge. The defendant stated that he was taking prescription medication. Toward the end of the interview, the defendant addressed Trooper Blaney as "Your Excellency."

Forensic evidence linked the defendant to Officer Guinta's shooting. Deoxyribonucleic acid (DNA) testing revealed that blood consistent with the defendant's was found on Officer

Guinta's gun. The defendant's left thumb print was found on the gun and on Officer Guinta's handcuff case. Blood consistent with Officer Guinta's was found on the floor inside the defendant's apartment. Blood spatter analysis indicated that Officer Guinta had been inside the defendant's apartment when he was shot. A copy of the defendant's resume found by police in a briefcase in the defendant's apartment contained blood consistent with both the defendant's and Officer Guinta's, and bore the defendant's bloody left thumb print. Firearms identification evidence revealed that Officer Guinta's gun had been fired six times. Ballistics evidence revealed that the one shot with a traceable trajectory was "[m]ost probably" fired from inside the apartment.

While at Bridgewater State Hospital the defendant had numerous conversations with a kitchen worker, and gave two versions of the shooting. The defendant told him that the version he eventually would recount depended on whether he was "offered" a disposition of "justifiable homicide." The defendant remarked that, because "no one saw him do it," he could not be found guilty.

There was evidence concerning the defendant's behavior before, and on the day of, Officer Guinta's killing. The Commonwealth's evidence described the defendant as a man who "hate[d] fucking cops"; who stated to Felix that the police would be sorry if they threw him off the basketball court again after curfew; who was able to conduct business with his landlord's property management company and pay his rent; and who was able to drive his automobile and obey traffic laws. On the day of Officer Guinta's killing, Felix "knew [the defendant] was a little bothered" that the police were giving him parking tickets. The defendant was also angry with a representative of the Fall River Gas Company who unsuccessfully attempted to collect an overdue bill.

The defendant did not testify. Through cross-examination of the Commonwealth's witnesses, and through his own witnesses, the defendant's trial counsel presented evidence supporting a defense that the defendant was not criminally responsible under the standards of *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). The defendant was an educated man, who had

obtained both criminal justice and law degrees and had served in the military. In early 1993, the defendant had been diagnosed as suffering from paranoid schizophrenia. The defendant's son, who lived with him in August, 1994, testified that the defendant thought that he (the defendant) was God and a Navy admiral. The defendant did not always recognize his own son. The defendant's son kept his own daughter away from the defendant because he thought she would not be safe in his presence. The defendant thought inanimate objects were animate, and put food in his hair, saying it needed food. The defendant threw away his medicine. The defendant sometimes left the apartment barefoot and in dirty clothes, and he rarely bathed.

During her cross-examination, Felix stated that the defendant often exhibited "very strange" behavior. After speaking with the defendant for about ten minutes, Felix noticed that he would become delusional, stating that he was a Cherokee Indian or that he was going to live in the Taj Mahal and be a king. In a basketball court across from the apartment building, the defendant would play basketball by himself, without shoes, for "all hours of the night." On the day of Officer Guinta's killing, despite an outside temperature of eighty-five degrees, Felix discovered the defendant inside his apartment with the oven door open and the stove turned on high. On more than one occasion around the time of the killing, a representative from the landlord's property management company tried to get help for the defendant, as did the defendant's mother.

Following the defendant's arrest, he was evaluated at various times by at least six psychologists and one psychiatrist, all of whom testified that he was mentally ill. Two of the professionals, forensic psychologist Ronald S. Ebert and psychiatrist Martin Kelly, arrived at the opinion, for different reasons, that the defendant was not criminally responsible for killing Officer Guinta. Specifically, Dr. Kelly testified that the defendant's schizophrenia resulted in the lack of capacity to conform his conduct to the requirements of the law, while Dr. Ebert testified that, because of schizophrenia, the defendant lacked the capacity to appreciate the wrongfulness of his conduct. The Commonwealth did not produce any expert witnesses to testify to the defendant's mental illness or criminal responsibility.

1. The defendant contends that, in defining murder in the first degree, the judge "effectively negated the criminal responsibility instruction that went before." When instructing on murder in the first degree on the theory of deliberate premeditation, the judge stated:

> "If the Commonwealth has proven to you beyond a reasonable doubt that the defendant had the specific intent to kill, then the defendant's mental impairment, if any, does not excuse or justify his actions."

Later, when instructing on murder in the first degree on the theory of extreme atrocity or cruelty, the judge stated:

> "If the Commonwealth has proved beyond a reasonable doubt the defendant had this specific intent to kill or to grievously injure the victim and the defendant had the requisite knowledge of the circumstances in which he acted, the defendant's mental impairment, if any, does not excuse or justify his actions."

The defendant argues that these instructions "inform[ed] the jury that if they found malice then lack of criminal responsibility was no justification or excuse." The defendant did not object to these instructions, so we review for a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Richardson*, 429 Mass. 182, 185 (1999). We find none.

Our duty is to look at "the charge as a whole to determine whether it fairly instructs the jury." *Id.*, quoting *Commonwealth* v. *Raymond*, 424 Mass. 382, 386 (1997). We have upheld nearly identical language to that challenged here. *Commonwealth* v. *Meinholz*, 420 Mass. 633, 637 (1995). Examining the charge in context, the judge correctly instructed the jury that they could consider the defendant's mental impairment, if any, in determining the defendant's capacity to form the specific intent to kill or to inflict grievous bodily harm. See *Commonwealth* v. *Gould*, 380 Mass. 672, 683, 685 (1980). The judge also correctly instructed the jury on criminal responsibility in accordance with the standards of *Commonwealth* v. *McHoul, supra.* In giving these instructions, the judge directed the jury that they were not to consider the issue of criminal responsibility, or "insanity,"

until *after* the Commonwealth had proved beyond a reasonable doubt that the defendant had committed criminal acts. The challenged instructions bore only on that first task, which the judge sufficiently explained, and did not deprive the jury of considering whether the Commonwealth also satisfied its burden of proving beyond a reasonable doubt that the defendant was criminally responsible.

Next, the defendant asserts, and the Commonwealth concedes, that the judge gave an erroneous, nonexistent "diminished capacity manslaughter" instruction.[3] The instruction had been requested by the defendant and was read by the judge as requested almost verbatim. The defendant argues that this instruction "shifted the burden of proof on the issue of insanity to the defendant." We conclude that the instruction created no substantial likelihood of a miscarriage of justice. In reviewing the charge in its entirety, the judge repeatedly instructed the jury that the Commonwealth bore the burden of proving beyond a reasonable doubt that the defendant was criminally responsible, and that the defendant had no burden of proving his lack of criminal responsibility. Further, in view of the jury's return of a verdict of murder in the first degree, it is unlikely that they even considered a manslaughter verdict.

2. In support of his motion for a new trial, the defendant offered numerous exhibits, including a transcript of an attorney-client conference (made before the defendant rested) on the issue whether the defendant wished to testify at trial, affidavits from the defendant, an affidavit from the defendant's mother,

---

[3]The instruction was as follows:

"Now, there is another possible basis for a verdict of manslaughter. If you should determine that the defendant killed the deceased without justification or excuse because of a mental condition and the defendant could not form the specific intent necessary for you to find that he acted with malice aforethought, you may find him guilty of manslaughter so long as you also find his mental condition did not rise to the level of insanity. Of course, should you find his mental condition did indeed rise to the level of insanity, you must find him not guilty of the crime of manslaughter as well as all of the other crimes of murder in the first degree, murder in the second degree, through either of the first degree murder theories."

various letters from the defendant to his parents or to his counsel, and various mental health reports. The judge denied the motion without making any specific comments on the credibility of the defendant's submissions. It can be inferred from the judge's denial of the defendant's motion, however, that he discredited the defendant's contentions stated in his affidavits and elsewhere. The judge did expressly refuse to resurrect any issues that the defendant had not properly preserved for appellate review, and declined to conduct an evidentiary hearing on the motion, a decision within his discretion. *Fogarty* v. *Commonwealth*, 406 Mass. 103, 110-111 (1989). As can be gleaned from our following discussion on the issues raised in the motion, the defendant failed to raise a "substantial issue" requiring an evidentiary hearing. *Id.* at 111. The judge properly denied the motion and committed no "significant error of law or other abuse of discretion." *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986).

(a) The defendant claims error in the judge's failure to read to the jury the last sentence of the murder statute, G. L. c. 265, § 1: "The degree of murder shall be found by the jury." Because the defendant's trial counsel did not request such an instruction or object to the judge's omission of this language, we review for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Gaskins*, 419 Mass. 809, 812 (1995); *Commonwealth* v. *Reid*, 384 Mass. 247, 258 (1981).

Although we have suggested that a proper charge on murder should comprise a full reading of the murder statute, *Commonwealth* v. *Dickerson*, 372 Mass. 783, 797-798 n.6 (1977), what the murder statute requires is that, where there is evidence of murder in the first degree, the judge must instruct on both murder in the first and second degrees. See *Commonwealth* v. *Paulding*, *ante* 1, 10 (2002); *Commonwealth* v. *Doane*, 428 Mass. 631, 633 (1999). See also *Commonwealth* v. *Robinson*, 382 Mass. 189, 196-197 (1981) (finding no risk of a miscarriage of justice stemming from judge's failure to read last sentence of murder statute to jury). The judge fulfilled this requirement by instructing the jury first on murder in the first degree and then on murder in the second degree. In addition to

defining murder in the second degree, the judge instructed the jury that if, after considering all the evidence, the Commonwealth had not proved murder in the first degree beyond a reasonable doubt, they were then to consider whether the Commonwealth had proved murder in the second degree beyond a reasonable doubt. Thus, in examining the entire charge, *Commonwealth v. Trapp*, 423 Mass. 356, 359, cert. denied, 519 U.S. 1045 (1996), the judge conveyed the proper legal concepts to the jury. The judge's omission of the final sentence of the murder statute did not deprive the jury of their power to find the appropriate degree of murder. The omission created no substantial likelihood of a miscarriage of justice.

(b) In his submissions accompanying his motion for a new trial, the defendant essentially claimed that his trial counsel failed to honor his choice not to present a defense based on a lack of criminal responsibility, or an "insanity" defense. In reliance on those assertions, the defendant argues that the judge was constitutionally required to conduct a colloquy with him to confirm his "knowing, intelligent, and voluntary endorsement" of, or waiver of, an insanity defense. The defendant relies principally on *Commonwealth v. Federici*, 427 Mass. 740, 744-745 (1998), in which we held that a competent defendant may choose to forgo an insanity defense when he "has been fully advised beforehand of the consequences of his actions by both defense counsel and the judge" (footnote omitted). In that case, however, the defendant had made it clear both to the judge and to defense counsel that he did not want to raise an insanity defense. *Id.* at 745. Here, there was no such apparent conflict between the defendant and his trial counsel that was made clear to the judge. Thus follows the defendant's argument that even an endorsement of an insanity defense requires a colloquy. We decline to extend our decision in *Commonwealth v. Federici, supra*, to impose such a requirement.

The judge did not err in concluding, inferentially, that the defendant's submissions made in connection with his motion for a new trial did not raise a substantial issue requiring an evidentiary hearing. There was sufficient evidence, particularly the

defendant's trial counsel's affidavit[4] and the transcript of the extensive attorney-client conference made during the trial, which, obviously credited, warranted the judge in rejecting the defendant's submissions. The transcript of the attorney-client conference also clearly establishes that, at the time of the trial, the defendant, who had been found competent to stand trial, and who possessed a law degree and a master's degree in criminal justice, had done his own research on the defense of lack of criminal responsibility and understood, and agreed to the presentation of, that defense.

(c) Relying on an affidavit in which the defendant states that he wanted to testify to "his actual innocence," but was precluded from doing so by his trial counsel, and on other documents to that effect, the defendant argues that the record does not support a finding that he made a knowing, intelligent, and voluntary decision not to testify. We disagree.

A defendant has the right to testify on his own behalf, and a "strict standard" applies to the waiver of that right. *Commonwealth* v. *Waters*, 399 Mass. 708, 716 (1987), and cases cited. The record of the attorney-client conference between the defendant and his trial counsel, made before the defense rested, demonstrates that the defendant's trial counsel repeatedly informed the defendant that the ultimate decision on whether to testify belonged to him. The judge likely credited this evidence. While the defendant's trial counsel, for various reasons that he explained on the record to the defendant, advised the defendant not to testify, he at all times emphasized that, ultimately, the decision was the defendant's. The defendant, although wavering, and never rendering a final decision on the record, expressed his understanding that the decision to testify at trial was "completely" his to make. The defendant's uncertainty as to whether he would testify reflects that his attorney had not foreclosed the defendant from making this critical decision, and that the defendant possessed a "sufficient awareness of the

---

[4] In his affidavit, the defendant's trial counsel stated: "At no time did I 'fail to honor' the defendant's decision not to offer an insanity defense. In fact, [the defendant] provided legal research and case law on the issue of the presentation of the insanity defense. He likewise cooperated on several occasions with the experts who testified at trial when they were performing their evaluations as to criminal responsibility and competency."

relevant circumstances and likely consequences" associated with that decision. *Commonwealth* v. *Freeman*, 29 Mass. App. Ct. 635, 640 (1990), quoting *McMann* v. *Richardson*, 397 U.S. 759, 766 (1970). The next morning, the defendant did not protest his trial counsel's decision to rest without presenting the defendant as a witness. See *Commonwealth* v. *Hennessey*, 23 Mass. App. Ct. 384, 387 (1987). There was no error.

(d) The judge correctly denied the motion for a new trial on the ground that the record allegedly did not support an intelligent and voluntary decision by the defendant to be medicated at trial. The defendant's argument is predicated on "[d]efense counsel's admitted failure to offer the defendant the opportunity to appear unmedicated during trial . . . ." There is no such admission in the record. Rather, in an affidavit, the defendant's trial counsel stated that he did not "specifically recall discussing the matter with [the defendant]," but that he had "numerous conversations with Dr. Ronald Ebert [a defense expert witness] as to his opinion on the issue of [the defendant's] appearing unmedicated." The defendant made no showing that he was medicated against his will or that he even asked to stop taking medication. In one of his affidavits, the defendant states that he is "not crazy," yet he made no showing how appearing in a medicated state would have undermined his competency to stand trial, limited his ability to present a defense, or otherwise been relevant. Cf. *Commonwealth* v. *Louraine*, 390 Mass. 28, 37-38 (1983) (not every defendant treated for mental illness is entitled to be observed by the jury in an unmedicated state, and "in some cases, the defendant's demeanor in an unmedicated condition will not be relevant").

3. The evidence that the defendant, with Officer Guinta's own gun, shot six times at Officer Guinta, inflicting three gunshot wounds, two from behind, and then later kicked Officer Guinta in the head while Felix was giving him chest compressions, amply supports the jury's finding of extreme atrocity or cruelty. Although the Commonwealth presented no expert testimony on the issue of the defendant's mental illness or criminal responsibility, there is no requirement to do so. *Commonwealth* v. *Monico*, 396 Mass. 793, 798 (1986) (the issue of insanity "may arise from the facts of the case, through the Com-

monwealth's witnesses, through lay testimony, or any combination thereof"). See *Commonwealth* v. *McHoul*, 352 Mass. 544, 551 (1967) ("psychiatry is far from an exact science and . . . whether a defendant is to be called sane or insane cannot depend on any certain measurement"). The same principle enures also to the benefit of a defendant. *Commonwealth* v. *Monico, supra* ("Expert psychiatric testimony is not necessary to raise the issue of insanity as a complete defense"). There was evidence from many lay witnesses, who had observed the defendant closer in time to Officer Guinta's killing than did the defendant's expert witnesses, that supported the jury's rejection of the insanity defense. Further, Dr. Ebert and Dr. Kelly were cross-examined extensively and gave testimony that would have warranted the jury in disregarding their ultimate opinions and concluding instead that, because the defendant had engaged in numerous activities that demonstrated an ability to conform his conduct to the requirements of the law, he was criminally responsible. The jury could also have considered the disagreement between them as to the relevant prong of the *McHoul* test as a matter affecting their credibility. "[I]t is not our function to second guess the jury." *Commonwealth* v. *Coyne*, 420 Mass. 33, 35 (1995). For these reasons, and after reviewing the entire record, we decline to exercise our power under G. L. c. 278, § 33E.

4. The defendant's judgment of conviction and the order denying his motion for a new trial are affirmed.

*So ordered.*