## Commonwealth vs. Jose M. Marrero.

Hampden. September 14, 2010. - April 7, 2011.

Present: Ireland, Spina, Cordy, Botsford, & Gants, JJ.

*Practice, Criminal,* New trial, Assistance of counsel, Capital case. *Constitutional Law,* Assistance of counsel. *Joint Enterprise. Homicide.*

A Superior Court judge, in ruling on a criminal defendant's motion for a new trial, did not abuse his discretion in concluding that an evidentiary hearing would serve no purpose beyond duplicative recitation of the statements proffered in the defendant's self-serving affidavit, and his counsel's equally unhelpful admission [239-241]; further, the judge's denial of the motion for new trial, in which the defendant alleged that his trial counsel never informed him of his right to testify on his own behalf, was not manifestly unjust, where the defendant failed to meet his burden of proving that he did not voluntarily and intelligently relinquish his right to testify [241-243].

At a murder trial, counsel's remarks in closing argument (in which counsel stated that the jurors were "clients" of the prosecutor; stated that the jury's decision "may not be the most important decision" they would ever make; and analogized the case to a poker game), although ill-advised, did not amount to error that was likely to have influenced the jury's conclusion, when considered in the context of the closing argument as a whole and in light of the judge's instructions to the jury. [243-246]

At a murder trial, the judge did not err in instructing the jury on a joint venture theory of murder, where the evidence at trial was sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime, with the intent required to commit the crime. [246-248]

Indictments found and returned in the Superior Court Department on April 7, 2005.

The cases were tried before *Peter A. Velis,* J., and a motion for a new trial, filed on June 18, 2009, was considered by him.

*Kevin S. Nixon* for the defendant.

*Thomas H. Townsend,* Assistant District Attorney, for the Commonwealth.

Cordy, J. On the evening of February 17, 2005, Jose Costoso was murdered in the parking lot of a Wendy's restaurant in Springfield. He was beaten by a group of men and shot twice at

close range. The defendant, Jose M. Marrero, was subsequently indicted for the murder and, after a jury trial, was found guilty of premeditated murder in the first degree.[1] The defendant appealed from the conviction, as well as from the judge's denial of his motion for a new trial (and for an evidentiary hearing) that was based on the defendant's allegation that his attorney never informed him of his right to testify on his own behalf at trial. On appeal, the defendant also claims that his trial attorney rendered ineffective assistance of counsel when he made certain remarks in closing argument that trivialized the jury's fact-finding function and diluted the Commonwealth's burden of proof; and that the judge erred in instructing the jury on a joint venture theory of murder when the Commonwealth presented no evidence that anyone other than the defendant acted as the principal in the crime. We affirm the convictions and decline to exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to reduce the murder verdict or grant other relief.

1. *Trial.* The jury could have found the following facts based on the evidence adduced at trial. Early in the evening of February 17, 2005, Jose Costoso, driving a green Ford Taurus automobile, picked up Rosa Cruz from the Diaz Market in Springfield. The two traveled in Costoso's vehicle to another location for the purpose of purchasing "crack" cocaine.[2] After purchasing and smoking the crack cocaine, Costoso and Cruz drove to the parking lot of a Wendy's restaurant, where Costoso began to repair the taillights on his automobile.

Ten minutes after Costoso entered the parking lot, a green sport utility vehicle pulled up behind his automobile and blocked it from leaving. The driver, Hector Garces, got out of the vehicle and began to hit Costoso. As he punched Costoso, Garces said, "I thought you wanted to beat Omar; I thought you wanted to beat Omar, you tough guy."[3] An unidentified passenger in the

---

[1]The defendant was also indicted and found guilty of assault and battery by means of a dangerous weapon (handgun), G. L. c. 265, § 15A (b); assault and battery, G. L. c. 265, § 13A; and the unlawful possession of a handgun, G. L. c. 269, § 10 (a).

[2]Rosa Cruz was a heroin addict. Jose Costoso and Cruz were "get high partner[s]," and when Costoso picked her up, Cruz had already consumed three bags of heroin and a heroin and cocaine mixture known as a "speedball."

[3]At trial, it was suggested that the Omar referred to by Hector Garces was

sport utility vehicle yelled to Cruz, "[G]et the hell out if you don't want no part of this."

As Cruz fled the scene, she saw three men running toward the parking lot, two of whom she recognized. One was Jesus Gonzalez, from whom she had purchased drugs in the past, and the other was Oscar Reyes, whom she recognized from "up the block." She had never seen the third man before, but noticed that he had a black mark on his cheek. This third man was later identified as the defendant. Reyes and the defendant joined Garces in beating Costoso on the driver's side of Costoso's vehicle. Soon after joining the fray, the defendant walked around to the passenger side of the vehicle and fired shots through the opened window, striking Costoso. One bullet entered Costoso's right upper back and pierced his lung and liver, killing him. Another bullet struck his left lower buttock.

Later that night, Springfield police detectives interviewed Cruz. She identified pictures of Gonzalez and Reyes from a photographic array as two of Costoso's attackers, but told police (falsely) that she could not describe anything about the person who fired the fatal gunshots (defendant). More than one year later, however, and after being summonsed to testify at the resulting trials,[4] Cruz told an assistant district attorney that, although she had been afraid to do so initially, she could identify the defendant as the shooter, and described him as having a black mark on his face.[5]

In any event, on the night of the murder, and based on Cruz's identification of his photograph, Gonzalez was arrested. Gonzalez, in turn, identified the defendant as the shooter and selected

Omar Cruz, the brother of the defendant's girl friend, who was not related to the Commonwealth's principal witness, Rosa Cruz.

[4]Jesus Gonzalez, Oscar Reyes, and Hector Garces were also charged with Costoso's murder. They were all tried separately. Gonzalez pleaded guilty to manslaughter. Reyes was convicted of murder in the second degree and other charges. The Appeals Court affirmed the convictions. *Commonwealth* v. *Reyes*, 74 Mass. App. Ct. 1115 (2009). Garces pleaded guilty to involuntary manslaughter.

[5]In the interim, Cruz had made several statements to private investigators working on behalf of the men charged with Costoso's murder. She told an investigator working for Reyes that she never saw the shooter's face, and she signed a statement drafted by another investigator in which she said that the shooter "looked like a teenager" (the defendant was, in fact, almost thirty years of age at the time). She was cross-examined vigorously at trial regarding these conflicting statements.

his picture from a photographic array. He also inculpated Garces and Reyes. Gonzalez subsequently signed a plea and cooperation agreement with the district attorney's office, in which he agreed to testify against the defendant in exchange for "consideration" on the resolution of the murder charge and two other charges for drug trafficking and illegal possession of a firearm then pending against him. At trial, Gonzalez testified that the defendant drew a gun while standing on the passenger side of the car and said, "I'm going to kill you," before shooting Costoso.

The day after the murder, and based on Gonzalez's identification of his photograph, Springfield police officers arrested the defendant. The defendant provided the police with an alibi, claiming that between the hours of 7 P.M. and 10 P.M. on the night of the murder he watched Spanish-language television with his girl friend in the apartment they shared, took a shower, and then the two continued to watch television until 12:30 A.M., when they went to bed.

After the defendant's arrest, police officers seized the black leather jacket that he was wearing. Samples from the jacket's cuffs were sent to a forensic laboratory in Pennsylvania, where they were analyzed for the presence of gunshot residue. David Freehling, the analyst who tested the jacket's cuffs, was qualified as an expert witness at trial. He testified that a small plume arises from a gun when fired, which releases particles into the air that then may fall on clothing in the immediate area of the gun. The clothing can be analyzed under an electron microscope. If any particle compound containing a fusion of lead, antimony, and barium, or two of those three elements, are detected, that is uniquely corroborative of the presence of gunshot residue. Freehling detected lead and antimony fused into a single particle on the sample cut from the left cuff of the defendant's leather jacket. This single particle also contained an "elemental tag[]" indicating a trace amount of tin. Tin is found in certain specific types of European ammunition. Based on these observations, Freehling testified that the single particle came from the firing of ammunition manufactured by a Czech company, Seiller & Bellot. There was further evidence that a .38 caliber class base portion of a metal projectile jacket was found behind the seat of the victim's vehicle, and a metal jacket fragment from a spent projectile was found embedded in the rear door behind the

driver's seat. Both bore the insignia "SB," indicating that they were manufactured by Seiller & Bellot.

Defense counsel objected to the admission of Freehling's testimony, arguing that the methodology Freehling used to identify gunshot residue was "voodoo science," and that both the Federal Bureau of Investigation and the American Society for Testing and Materials have rejected gunshot residue analysis as unreliable. The judge overruled the objection, concluding that the subjects raised by counsel were proper for cross-examination.[6] We now discuss each claim of error in turn.

2. *Denial of evidentiary hearing and motion for a new trial.* In an affidavit submitted in support of his motion for a new trial, the defendant averred that he told his counsel "early on" that he wanted to testify, and the attorney responded by saying "something like we would cross that bridge when we came to it." The defendant stated that he was dissatisfied at trial, and again told his attorney that he wanted to testify, but was told "something like don't worry, everything's going fine." According to the defendant's affidavit, the attorney subsequently told the defendant it would be a "bad idea" for him to testify. The defendant further claimed that he was never informed that the decision whether to testify was committed solely to him.

The defendant's trial counsel also provided an affidavit with the defendant's motion, which stated, in part:

> "I do not remember whether I told Mr. Marrero that he had a right to testify; nor do I remember whether I told him that it was not up to me but solely up to him whether he should testify. I do remember that Mr. Marrero told me that he wanted to testify and tell the jury that he had not played any role in the shooting of the victim in this case but was at home watching TV when that happened. Mr. Marrero told me of his desire to testify both before trial and during the trial, and at trial I advised him that in my view he should not testify."

[6]The defendant had not filed a motion in limine either challenging the admissibility of this evidence or requesting a *Lanigan* hearing. *Commonwealth* v. *Lanigan,* 419 Mass. 15, 24-26 (1994). Its admissibility is not challenged on appeal, and on the record before us, its admission was not error. *Commonwealth* v. *Pytou Heang,* 458 Mass. 827, 851 (2011) (upholding admissibility of expert testimony regarding gunshot residue analysis).

"A motion for new trial is addressed to the sound discretion of the judge, . . . and the judge's disposition of the motion will not be reversed unless it is manifestly unjust, . . . or unless the trial was infected with prejudicial constitutional error" (citations omitted). *Commonwealth* v. *Lucien*, 440 Mass. 658, 669-670 (2004) (*Lucien*). The judge may rule on the motion for a new trial from the face of the affidavits or other supporting material, without an evidentiary hearing, "if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). See *Commonwealth* v. *Denis*, 442 Mass. 617, 628 (2004) (*Denis*). However, "where a substantial issue is raised and is supported by a substantial evidentiary showing, the judge should hold an evidentiary hearing." *Commonwealth* v. *Stewart*, 383 Mass. 253, 260 (1981). Thus, "[i]n determining whether a motion for a new trial warrants an evidentiary hearing, both the seriousness of the issue itself and the adequacy of the defendant's showing on that issue must be considered." *Denis*, *supra*, citing *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348 (2004).

The defendant's claim in this particular motion for a new trial raises "an issue of constitutional importance" that readily qualifies as a serious issue. *Commonwealth* v. *Licata*, 412 Mass. 654, 661 (1992). "The right to testify on one's own behalf in a criminal case is fundamental." *Commonwealth* v. *Degro*, 432 Mass. 319, 335 (2000), citing *Harris* v. *New York*, 401 U.S. 222, 225 (1971). Accordingly, our analysis whether an evidentiary hearing was required focuses on the adequacy of the showing made by the defendant with respect to that issue. See *Denis*, *supra*. In reviewing the adequacy of the showing, the defendant's submissions in support of a motion for a new trial need not prove the factual premise of that motion, see *Commonwealth* v. *Licata*, *supra* at 662, but they must contain sufficient credible information to "cast doubt on" the issue. See *Commonwealth* v. *Britto*, 433 Mass. 596, 608 (2001).

Here, there was no abuse of discretion in the judge's assessment that the defendant's motion did not make an adequate evidentiary showing that the waiver of his right to testify was invalid.[7] The defendant submitted two pieces of evidence in

---

[7] The judge originally denied the defendant's motion for a new trial without

support of his motion for new trial: his own affidavit and the affidavit of his defense counsel. As a threshold matter, the judge discredited the defendant's postconviction affidavit. This was not error. A defendant's "self-serving affidavits and assertions are not sufficient, on their own, to raise a substantial issue" warranting an evidentiary hearing. *Denis, supra* at 633-634, quoting *Commonwealth* v. *Scoggins*, 439 Mass. 571, 578 (2003). "The judge was entitled to reject summarily any claim supported only by the defendant's self-serving affidavits, and infer from his own observation of the defendant and counsel at trial that they were conferring over precisely the matter the defendant now claims was never discussed." *Lucien, supra* at 672-673.

Therefore, the judge considered only the affidavit submitted by counsel and his own observations of the defendant interacting with counsel during the proceedings. See Mass. R. Crim. P. 30 (c) (3); *Denis, supra*. In his affidavit, the defendant's counsel did not state that he neglected to inform his client that the decision to testify belonged solely to him. Rather, he claimed a lack of memory. "If the theory of the motion, as presented by the papers, is not credible or not persuasive, holding an evidentiary hearing to have the witnesses repeat the same evidence (and be subject to the prosecutor's cross-examination further highlighting the weaknesses in that evidence) will accomplish nothing." *Commonwealth* v. *Goodreau, supra* at 348-349. The judge did not abuse his discretion in concluding that an evidentiary hearing would serve no purpose here beyond duplicative recitation of the statements proffered in the defendant's self-serving affidavit, and his counsel's equally unhelpful submission.

We similarly conclude that the judge's denial of the motion for new trial was not manifestly unjust. A defendant has the burden of proving that his waiver of his right to testify was invalid. *Lucien, supra* at 671, citing *Commonwealth* v. *Freeman*, 29 Mass. App. Ct. 635, 641-642 (1990). He must "prove, by a preponderance of the evidence, that, but for his counsel's

an evidentiary hearing by writing "denied" on the face of the motion, and entering that ruling on the docket. After oral argument, we entered an order remanding the case to the judge for the purpose of having him provide a statement of his specific reasons for denial of the motion, and denial of the request for an evidentiary hearing. Pursuant to our order, on February 4, 2011, we received a memorandum of decision and order on the defendant's motion for an evidentiary hearing and a new trial.

erroneous advice . . . he would have testified in his own defense." *Commonwealth* v. *Freeman, supra* at 642. It is not enough to say that counsel had discouraged him from testifying. See *Commonwealth* v. *Cook,* 438 Mass. 766, 776-777, cert. denied, 540 U.S. 850 (2003). The defendant must show that waiver of the right was neither voluntary nor intelligent. See *Commonwealth* v. *Degro, supra* at 335-336.

The judge concluded that the defendant discussed his desire to testify with his counsel on at least three occasions. During these conversations, the defendant stated his desire to testify, and the counsel responded that "in [his] view" the defendant should not. The judge found that the counsel "did not do or say anything to indicate that Marrero could not testify without his permission."[8] Moreover, as the trial transcript reflects, at the end of the defendant's case, defense counsel asked for time to speak to his client. A discussion, held off the record, then ensued between the defendant and counsel, at the conclusion of which the defense rested. The Commonwealth argues, and we agree, that the context and timing of this discussion permits the inference that the defendant and counsel discussed further whether the defendant would testify at this, the last possible juncture where the decision could be made. See *Commonwealth* v. *Cook, supra.*

In all, the defendant has failed to meet the burden of proving that he did not voluntarily and intelligently relinquish his right to testify, and on that basis the motion was properly denied.[9]

---

[8] The defendant's counsel was very experienced in the practice of criminal law, having defended numerous clients in capital cases. It would not have been inappropriate for the judge to consider such experience in determining whether defense counsel (although claiming not to remember one way or the other) would have neglected to advise the defendant correctly on such a fundamental matter routinely arising in criminal trials. See *Matter of Grand Jury Subpoena,* 739 F.2d 1354, 1358 (8th Cir. 1984) (in ineffectiveness claim, "[w]e also consider counsel's experience"). See also *Commonwealth* v. *Tevlin,* 433 Mass. 305, 316 (2001) (decision based on advice of counsel "with considerable experience").

[9] The defendant does not argue that his counsel's decision to discourage him from testifying, as opposed to failing to inform him that it was his decision to waive that right, constituted ineffective assistance of counsel. Even if he had, this discouragement did not amount to an error "likely to have influenced the jury's conclusion" or otherwise create a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992). Such advice would best be characterized as a "tactical decision" that only rises to the level of ineffectiveness "if it was manifestly unreasonable when made." *Com-*

See Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001); *Commonwealth* v. *Degro, supra* at 337.

3. *Ineffective assistance of counsel.* The defendant contends that two statements made by his counsel during closing argument were highly prejudicial because they aligned the jurors with the prosecution, trivialized their somber fact-finding function, and diluted the rigor of the reasonable doubt standard of proof required to convict. Cf. *Commonwealth* v. *Bonds*, 424 Mass. 698, 701-702 (1997) (judge's charge to jury); *Commonwealth* v. *Ferreira*, 373 Mass. 116, 129 (1977) (same). First, at the outset of his closing argument to the jury, defense counsel stated:

> "When you're involved in a capital case, usually you get to deal with whoever is at the top of the food chain. And this is that type of case. [The prosecutor], he wants to win; I want to win. The interesting thing is both of us demand justice.

> "[The prosecutor] has as his clients you, members of the Commonwealth. Those people over there [the victim's family], they demand justice. They lost a life that was close to them. He deserves your consideration. It's important that you do that and exercise the oath that you took, because while this may not be the most important decision you ever make in your life, it will be an important decision, probably one that you'll remember for a long time. The defendant, the same thing, he deserves your consideration. He demands justice. That's the way it is."

Just a few seconds later, still at the beginning of the closing argument, defense counsel continued:

> "I suggest to you that oftentimes [the prosecutor] and I

monwealth v. *Coonan*, 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). The record is silent in this regard, but we can postulate that the defendant's counsel had tactical reasons to support his advice that were not "manifestly unreasonable," such as sheltering the defendant from impeachment. See *Commonwealth* v. *Jenkins*, 458 Mass. 791, 804-805 (2011). Even still, to constitute ineffectiveness, we would have to determine that the jury would have likely believed the defendant's self-serving and (apparently) uncorroborated alibi over both the testimony of Cruz and Gonzalez that placed the defendant at the scene, and the physical evidence suggesting the defendant had fired a gun with ammunition matching the shell casings found at the scene. See *Commonwealth* v. *Coonan, supra.* We do not so conclude.

appear before jurors arguing capital cases, and most of the time it depends on the hand that you're dealt. And I suggest to you that this is sort of like Texas Hold 'Em. He has two hold cards that are down, and those hold cards, that's Ms. Cruz and Mr. Gonzalez. That's really his case. If you believe those witnesses, then my client must be guilty. If you don't believe those two witnesses, then my client must be innocent."

The defendant argues that by framing his closing argument with these two introductory statements, his counsel sounded three themes, all which worked to his client's detriment: (1) the jurors were aligned with the prosecution as "clients" of the prosecutor; (2) the trial was merely a "poker game" between two experienced attorneys where the winner was the lawyer with the best cards; and (3) the jury's decision, though memorable, was not "the most important decision" they will ever make.[10] Together, the defendant argues that these statements would have impermissibly created a preference for the prosecution's evidence, and diluted the exacting nature of the Commonwealth's burden of proving its case beyond a reasonable doubt by equating that standard with "important decisions affecting [the jury's] own economic or social lives," *Commonwealth* v. *Ferreira*, *supra* at 128, and worse, a poker game. See *Commonwealth* v. *Bonds*, *supra*.

For claims of ineffective assistance of counsel in capital cases, we review pursuant to G. L. c. 278, § 33E, to determine whether there exists a substantial likelihood of a miscarriage of justice. This is a standard of review that is "more favorable to a defendant" than that set forth in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). *Commonwealth* v. *Williams*, 453 Mass. 203, 204-205 (2009), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). We do not discern error in defense counsel's statements that would create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Williams*, *supra*.

[10]The defendant also argues that the prejudice created by these remarks was exacerbated by counsel's repeated reference to his decades of experience in trying capital cases. Among other statements, counsel told the jury he was an attorney "at the top of the food chain," and had "been doing this for thirty-four years."

To begin, the statements on which the defendant relies occurred early in his counsel's argument and must be "considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Degro*, 432 Mass. 319, 333-334 (2000). Although defense counsel seemed to equalize, if not minimize, the Commonwealth's rigorous burden of proof in his early statements, he concluded his summation with an appropriate admonition to the jurors: "You need to analyze whether or not you believe the statements of [the witnesses] under the standards that the judge tells you as to proof beyond a reasonable doubt, and listen to what he says." This followed a lengthy and vigorous attack on the credibility of the Commonwealth's principal witnesses, in which counsel assailed Cruz's multiple conflicting statements and the fact that she was on heroin while observing the crime, and impugned the adverse implications of Gonzalez's cooperation agreement with the Commonwealth. Similarly, in his charge to the jury, the judge defined the Commonwealth's burden of proving the elements of each crime beyond a reasonable doubt precisely as we set out in *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). The judge's charge to the jury explaining the reasonable doubt standard without any perceptible deviation from the model formulation was sufficient to cure any confusion that could have arisen from counsel's rhetoric at the beginning of his closing argument. See *Commonwealth* v. *Degro, supra.* Viewing this instruction in light of the remainder of counsel's summation, there was no discernible error that "was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright, supra* at 682.

Nor do we conclude that any individual statement complained of by the defendant, when viewed in isolation, created a substantial likelihood of a miscarriage of justice. First, although the statement that the prosecutor had the members of the jury "as his clients" was ill advised, this misstep in speech is best understood as an "awkward rhetorical flourish" to counsel's greater argument that both parties in the case, including the defendant, demanded justice. *Commonwealth* v. *Coleman*, 30 Mass. App. Ct. 229, 236-237 (1991) (finding no reversible error in defense counsel's statement that "burden of proof is on the government, on the Commonwealth, of which you are a part, and the burden is on you . . . to hear all this evidence").

Second, while counsel's statement that the jury's decision "may not be the most important decision" they ever make was unfortunate, it was immediately followed by the admonition that "it will be an important decision" and "probably one that you'll remember for a long time." See *id.* at 237. Any diminution of either the solemnity of the jury's fact-finding function in a capital case or the quantum of proof required to meet the reasonable doubt standard that could implicitly be found in counsel's statement did not rise to the level of triviality that we have concluded merited reversal in the past. His statement is more akin to a verbal stumble on the way to his broader point that, in fact, emphasized the seriousness of maintaining fidelity to the notion of justice.

Lastly, while the statement analogizing the case to a poker game may have been an ill-advised attempt at colloquial humor and analogy, it did not amount to a reversible diminution of the reasonable doubt standard of proof, nor did it marginalize the solemnity of the jury's duty. See *Commonwealth* v. *Silva*, 388 Mass. 495, 508 (1983). Perhaps the analogy was too convoluted, or did not register with the jury, but we acknowledge "[a] certain measure of jury sophistication in dealing with argument . . . ." *Commonwealth* v. *Benson*, 419 Mass. 114, 119 (1994).

In sum, several, and perhaps even all, of the statements complained of by the defendant were improvident, but the "guaranty of the right to counsel is not an assurance to defendants of brilliant representation or one free of mistakes." *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 13-14 (1973). After examination of the isolated statements, and in view of their context in the closing argument as a whole, we do not conclude they amounted to error that "was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright, supra.*

4. *Joint venture instruction.* The defendant argues that the judge erred by not entering required findings of not guilty on the charges of murder in the first degree and murder in the second degree, and unlawful possession of a firearm, on theories of joint venture liability, and erred thereafter in instructing the jury on joint venture liability. The jury returned their guilty verdicts on a general verdict form, which did not indicate whether their decision rested on a principal or joint venture theory of liability, both of which were presented to the jury.

The defendant's argument rests on statements by this court, in cases of older vintage, that when the Commonwealth proceeds on a joint venture theory of criminal liability, it "must present evidence that a principal other than the defendant committed the [offense]." *Commonwealth* v. *Stokes*, 440 Mass. 741, 745 (2004). Cf. *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995). Here, the defendant argues that the Commonwealth presented no witnesses, nor any forensic evidence, that offered even the faintest suggestion that any of the defendant's coventurers fired the fatal gunshot, or were in possession of a firearm. Therefore, the evidence was insufficient to convict the defendant on a joint venture theory. On review, we do not "examine the sufficiency of the evidence separately as to principal and joint venture liability"; rather, "we . . . examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime." *Commonwealth* v. *Zanetti*, 454 Mass. 449, 468 (2009). See *Commonwealth* v. *Housen*, 458 Mass. 702, 706-707 (2011).

The evidence in this case was sufficient to support a finding that the defendant shot and killed Jose Costoso, and that he harbored the requisite intent to commit the crime of murder in the first degree. Both Cruz and Gonzalez placed the defendant at the scene of the crime and identified him as the shooter. Moreover, forensic testing revealed that a single particle of gunshot residue on the cuff of the defendant's jacket was consistent with Seiller & Bellot ammunition. Police retrieved shell casings from Seiller & Bellot ammunition at the scene of the killing. While the defendant's counsel aggressively challenged the scientific validity of gunshot residue testing methods in cross-examining the Commonwealth's expert witness, the jury were entitled to assign their own weight to the forensic evidence. Additionally, from Garces's statement, "I thought you wanted to beat Omar," the jury could have found that the motive for the killing was to settle a score between "Omar" and the victim, Costoso. As for the issue whether the defendant demonstrated the requisite intent to permit a finding of guilty on the charge of murder in the first degree, at trial, Gonzalez testified that the

defendant said, "I'm going to kill you," before shooting Costoso. If believed, this was sufficient evidence to prove the defendant acted with specific intent to commit murder. Therefore, the evidence at trial was sufficient "to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime." *Commonwealth* v. *Zanetti, supra.*

5. *G. L. c. 278, § 33E.* We have reviewed the briefs, the entire record, all the issues, and the arguments of counsel. We see no reason to exercise our powers under G. L. c. 278, § 33E, to reduce the degree of guilt on the murder conviction or order a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*